IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NAJIY-ULLAH 'AZIYZ,

        Plaintiff,

v.

CAMECA, a Wisconsin Profit Corporation;
STEVEN TURNBULL, individually and in
His capacity as a manager;
ANNIE STROUD, individually and in her capacity
As a manager; and
FABRICE LeDUIGOU, individually and in
His capacity as a manager,

        Defendants.

OPINION AND ORDER

20-cv-896-wmc

In this civil action for damages, *pro se* plaintiff Najiy-Ullah 'Aziyz, who is black, claims that defendant Cameca, Inc., violated federal antidiscrimination laws, the Fair Credit Reporting Act, 15 U.S.C. § 1681b(b)(3)(A), and various state laws by failing to make him a "good faith" offer of employment after discovering that he had an old felony conviction. All defendants have moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(6), contending primarily that none of plaintiff's claims is actionable because, as 'Azyiz admits in his complaint, Cameca *offered* him a job and 'Azyiz rejected it.[1] (Dkt. #20.) Because the admissions in the amended complaint disprove plaintiff's allegations of unlawful discrimination or violation of his rights under the FCRA, the court will dismiss his federal

---

[1] Defendants initially moved to dismiss the complaint on December 4, 2020 (dkt. #10), which prompted plaintiff to file an amended complaint. (Dkt. #12.) At a telephonic pretrial conference on March 30, 2021, Magistrate Judge Stephen Crocker advised the parties that the court had accepted plaintiff's amended complaint as the operative pleading in the case, and he set a deadline for defendants to file any supplemental motion to dismiss with respect to the amended complaint. (3/30/21 Text Only Ord. (dkt. #16)). Defendants responded by filing a new motion to dismiss that fully addresses the allegations in the amended complaint. Accordingly, their initial motion will be dismissed as moot.

claims under Rule 12(b)(6) and decline to exercise supplemental jurisdiction over the remaining state law claims, which will be dismissed without prejudice for lack of jurisdiction.

ALLEGATIONS OF FACT[2]

Plaintiff Najiy-Ullah 'Aziyz, who is black, is a resident of the State of New York. At all relevant times, he was 52 years old. Defendant Cameca is a Wisconsin corporation that supplies scientific instruments. At the relevant times, defendant Steven Turnbull was Cameca's Vice President of Human Resources; defendant Annie Stroud was its Human Resource Manager; and defendant Fabrice LeDuigou was its Service Manager.

On July 14, 2020, LeDuigou interviewed 'Aziyz for a Field Service Engineer job with Cameca. On July 20, Cameca offered 'Aziyz the position, which would report directly to LeDuigou. That same day, 'Aziyz accepted the job offer and forwarded a signed copy to defendant Stroud. The parties agreed that 'Aziyz's first day at Cameca would be Monday, August 10, 2020, and on or about July 27, LeDuigou emailed 'Aziyz, stating that he was looking forward to him joining the team and informing him that Cameca would be providing him with a cellphone.

Cameca has a policy of considering applicants with a criminal history for employment. It also has a policy of conducting a "7-10 years background check" of its applicants. As part of its hiring process, Cameca hired a third-party vendor, HireRight, to

---

[2] In addressing a pro se litigant's complaint, the court must read the allegations generously. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). For purposes of this opinion and order, the court assumes the following facts based on the allegations in plaintiff's detailed, 40-page amended complaint.

conduct a background check on 'Aziyz. HireRight finalized its report on July 28, 2020. That same day, defendant Stroud sent 'Aziyz a "welcome aboard" email. Over the next few days, Stroud communicated with 'Aziyz about tax forms, his upcoming orientation, and mailing his computer and company phone to his home.

On or about August 6, 2020, however, Stroud called 'Aziyz and told him that, in performing her own background investigation, she discovered that 'Azyiz had a felony conviction. Stroud told 'Azyiz that she had shared this information with LeDuigou, who became "upset" that 'Azyiz had not disclosed this information during the interview process. Stroud told 'Azyiz that she would have to report the conviction to Cameca's corporate office and rescind the job offer.

So far as it appears, however, Stroud did not have final say over new hires at Cameca. The next day, she called 'Azyiz and told him that: (1) she was wrong for sharing the information about his conviction with LeDuigou; and (2) Cameca actually wished to *proceed* with 'Azyiz's orientation on August 10. Stroud also attempted to set up a conference call with LeDuigou and 'Azyiz to talk, but the parties were unable to find a time that worked. That same day, defendant Turnbull also called 'Azyiz, apologized for how things had been handled, and explained how the company had discovered 'Azyiz's felony conviction. According to Turnbull, after receiving HireRight's background check, Stroud noticed that 'Azyiz's age and graduation date did not coincide with his work history, so she followed up with LeDuigou to see what he had learned during 'Azyiz's interview. Turnbull told 'Azyiz that it was LeDuigou (not Stroud) who then conducted the internet search that led to the discovery of the conviction. Turnbull further admitted

3

during this conversation that Stroud, LeDuigou, and he "acted discriminatory towards Plaintiff based on race and age." (Am. Cmpt. (dkt. #12) ¶98.) Finally, later that same day, Turnbull emailed 'Azyiz and said he was looking forward to him starting with Cameca.

The next day, August 8, 'Azyiz emailed Turnbull and asked (1) how he could "ensure that I will not be targeted by [LeDuigou]" and (2) whether there were any other managers or departments for whom he could work. Turnbull responded the following day, assuring 'Azyiz that Cameca maintained a fair working environment and LeDuigou had been reminded of and confirmed that he would comply with Cameca's anti-discrimination policies. Turnbull also emphasized that Cameca's "good faith and commitment to the Code of Ethics is evidenced by our decision to move forward to hire you after being informed of your past criminal convictions." (*Id*. ¶104.)

On August 10, 'Azyiz's planned start date, Turnbull again emailed him to ask whether he had received the previous email and intended to report to work that day. 'Azyiz responded that he did not intend to join Cameca because it had not assured him that he would not be a target of retaliation or that the job offer was in good faith. Cameca then allegedly filled the Field Service Engineer job with someone who was "sufficiently younger" than 'Azyiz.

'Azyiz's amended complaint in this case now alleges the following federal claims against Cameca: (1) Disparate Impact Race Discrimination; (2) Disparate Treatment Age Discrimination; and (3) Violation of the Fair Credit Reporting Act. In addition, he purports to allege six more causes of action under Wisconsin common law, invoking the

4

court's supplemental jurisdiction under 28 U.S.C. § 1367.[3] 'Azyiz further alleges economic, as well as emotional, damages in the form of depression, humiliation, embarrassment, and anger.

OPINION

Defendants move to dismiss the amended complaint in its entirety, arguing that the complaint fails to state any claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). To avoid dismissal, plaintiff's pleading must contain allegations that "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

When reviewing whether a complaint adequately states a claim, the court accepts as true all material allegations of the complaint and construes the complaint in favor of the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). However, legal conclusions and conclusory allegations are not entitled to this presumption of truth. *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). A complaint generally "does not need detailed factual allegations," but it "must be enough to raise a right to relief above the speculative level." *Twombly*, 550

---

[3] These claims are: (1) Breach of Contract/Promissory Estoppel (against Cameca); (2) Intentional Interference With Contract (against individual defendants); (3) Breach of Confidentiality of Personnel Records (against Cameca); (4) Breach of Good Faith Job Offer (against Cameca); (5) Negligence (against all defendants); and (6) Intentional Infliction of Emotional Distress (against all defendants).

U.S. at 555. Even more important here, while a *pro se* complaint must be held to less stringent standards than formal pleadings drafted by lawyers, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), even a *pro se* plaintiff can plead himself *out of court* if he pleads facts that preclude relief. *See Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007); *McCready v. Ebay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006).

A plaintiff "pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits." *Tamayo*, 526 F.3d at 1086 (quoting *Kolupa v. Roseel*, 438 F.3d 713, 715 (7th Cir. 2006)). Even where the plaintiff voluntarily provides *unnecessary* facts in the complaint, the defendant may use those facts to demonstrate that he is not entitled to relief. *McCready*, 453 F.3d at 888; *Jackson v. Marion County*, 66 F.3d 151, 153–54 (7th Cir. 1995). Defendants argue that plaintiff's admission that Cameca offered him a job, after apologizing for its awkward handling of his conviction record, did just that: pleaded his way out of court by showing that he was neither subject to an adverse action nor sustained damages, which are necessary elements of all of his federal claims. Taking each claim in turn, the court agrees for the reasons that follow.

I. **Disparate Impact Under Title VII**

Title VII prohibits both job-related actions that are motivated by intentional discrimination against employees based on protected employee statuses such as race or sex, as well employment practices that have a disproportionately adverse impact on employees

with protected characteristics, even if the impact is unintended. *Ernst v. City of Chicago*, 837 F.3d 788, 794 (7th Cir. 2016). Plaintiff in this case asserts the second type of discrimination -- disparate impact. A plaintiff alleging a disparate impact is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988). In addition, in a failure-to-hire case, he must support his claims of racial disparity by including some "basic allegations" showing the racial makeup of the employer's workforce as compared to the relevant, qualified labor pool. *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1007 (7th Cir. 2019).

To bring any sort of discrimination claim under Title VII, a plaintiff must show that he suffered an adverse employment action as a result of the employer's alleged discrimination. *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). To be actionable, "an adverse action must materially alter the terms or conditions of employment." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012); s*ee also Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62, (2006) (explaining that the terms of the antidiscrimination provision of Title VII "explicitly limit the scope of that provision to actions that affect employment or alter the conditions of the workplace"). "The idea behind requiring proof of an adverse employment action is simply that a statute which forbids *employment* discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000) (emphasis in original)(citations omitted).

Here, plaintiff purports to challenge Cameca's policy of "performing additional unrestricted media searches and using found data against applicants." (*Id*. ¶ 129.) Although plaintiff does not explain what he means by "additional," presumably he is referring to a search broader in scope than the media search conducted by HireRight, the agency hired by Cameca to do his background check. According to plaintiff, this practice had a discriminatory impact on black applicants "in that a lower percentage of African-American employers prevail in employment and advancing with the company as compared to white employees." (Id. at ¶132.) This is so, he alleges, because blacks are incarcerated at a higher rate than whites. (*Id*. ¶¶131, 133.) Finally, he alleges that, as a result of Cameca's "unfair practice," he was "restricted" by not receiving a "'Good Faith' job offer, employment, wages, and other benefits because of his race," which "further resulted in his denial of employment." (*Id*. ¶134.)

The court agrees with defendants that these threadbare allegations concerning the relative incarceration rates of blacks versus whites fail to allege plausible disparate impact in defendant's hiring or employment practices.[4] More fundamentally, however, plaintiff's disparate impact claim fails here because he acknowledges suffering *no* adverse action as a result of that employment practice. As defendants point out, plaintiff's own allegations show that plaintiff was *not* "denied employment, wages, and other benefits" as he claims;

---

[4] To begin, that blacks are *incarcerated* at higher rates than whites may be different from rates of *conviction,* a comparison missing from plaintiff's complaint. More importantly, plaintiff's complaint provides *no* information about the percentage of blacks employed *by Cameca* in comparison to the percentage of blacks in the total qualified local labor force or to the percentage of otherwise-qualified blacks in the applicant pool. Some basic allegations to this effect would be necessary to plausibly allege that Cameca's practice of performing a wide-ranging internet search of its applicants had a disproportionate effect on black applicants.

8

to the contrary, he admits that Cameca *offered* him a job, *which he rejected*. As a result, whether or not Cameca's policy of "using found [internet] data against applicants" has a discriminatory effect on *other* applicants, *plaintiff* cannot assert this claim because it had no effect on *him*. *See Farrell v. Butler University*, 421 F.3d 609, 617 (7th Cir. 2005) (plaintiff professor who was deemed eligible for award and actively considered by selection committee lacked standing to complain that eligibility requirements had disparate impact on women by making women less likely to be found eligible for consideration); *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 578 (6th Cir. 2004) ("Even if Honda management abused the system by disproportionately counseling African–Americans at the managerial level, neither Bacon nor Harden was subjected to this treatment and therefore cannot raise it as part of an individual disparate impact claim.").

Having affirmatively pleaded it, plaintiff cannot dispute that he rejected Cameca's job offer, nor does he attempt to do so. Instead, he insists that he "rightfully" declined the offer because it was made in "bad faith." Although he acknowledges that Turnbull called on August 7 to both apologize *and* affirm that Cameca still wished to hire him, plaintiff asserts that Turnbull's apology was "followed by lies, deception, and hollow promises." (Br. in Opp. (dkt. #21), at 12.) Plaintiff also lists a number of things that he believes Cameca was required to do before he accepted the job offer, including: (1) reporting his claim of discrimination to the Vice President; (2) ending its practice of unrestricted media searches; (3) offering him a position with a supervisor other than LeDuigou; and (4) holding Turnbull, LeDuigou or Stroud "accountable" for their actions. (Plt.'s Br. (dkt. #21) 18, 23.) In addition, he points out that as of August 10, 2020, the day he was

9

supposed to report to work, he still had not received his company phone or computer. In light of all of this, plaintiff argues, he reasonably concluded that Cameca "had no intentions" of treating him fairly in the workplace, so he rejected the job offer.

Read liberally in his favor, plaintiff may be seeking relief under a "constructive discharge" theory. "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Fitzgerald v. Henderson*, 251 F.3d 345, 357–58 (2d Cir. 2001). Plaintiff cites no case, however, extending this concept to the failure-to-hire context. Indeed, the court cannot conceive how a job *applicant* could show that his working conditions had become "intolerable" without ever starting the job. Regardless, plaintiff's allegation that Cameca's work environment was certain to be hostile is again contradicted by the facts affirmatively alleged in the amended complaint. Specifically, within 24 hours of suggesting that it would be rescinding his job offer, plaintiff admits that Cameca instead:  (1) reaffirmed its original job offer; (2) apologized for "how things [had] been handled" during plaintiff's transition; (3) told plaintiff that Cameca was excited about plaintiff joining the team; and (4) assured him that it would abide by its anti-discrimination policies. Plaintiff did not have to *believe* Cameca's assurances that it would treat him fairly, but his wholly subjective and unsupported belief that he *might* be subject to future harm does not amount to a "denial of employment," whether actual or constructive. *See Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333–34 (7th Cir. 2004) ("The only way to know how matters will turn out is to let the process run its course. Litigation to determine what *would* have happened . . . is a poor substitute for the actual

results of real deliberation within the employer's hierarchy.") (emphasis in original). Indeed, as pleaded, Cameca's single misstep would not begin to make out a constructive "empty offer" or "discharge" claim.

Apart from a theory that he was somehow constructively denied employment, the only other possible adverse action to which plaintiff was subject was Stroud's August 6 announcement that Cameca would be rescinding the job offer, an announcement she not only reversed the very next day, but acknowledged never having the authority to rescind in the first place. It is well-settled, however, that an employer's mere threat to take an adverse action is not actionable. *See, e.g, Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1121 (7th Cir. 2009) ("Nagle did not suffer any hardship connected with the suspension because he never actually served it."); *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) ("Simply put, a suspension without pay that is never served does not constitute an adverse employment action."); *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003) ("An unfulfilled threat, which results in no material harm, is not materially adverse."); *Irving v. City of Elkhart*, 94 F. App'x 358, 361 (7th Cir. 2004) ("mere prospect of harm" does not constitute an adverse employment action"); *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) (finding no adverse employment action when employee was given a new reporting structure but the employer "rescinded the change the following day in response to [employee's] complaint, and did so with an apology."); *Keeton v. Flying J, Inc.*, 429 F.3d 259, 264 (6th Cir. 2005) ("termination lasting only hours" not an adverse employment action); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) ("[T]he decision to reprimand or transfer an employee, if rescinded before the

11

employee suffers a tangible harm, is not an adverse employment action.")(citations omitted).

Here, nothing in the complaint suggests that plaintiff suffered *any* tangible harm between Stroud's August 6 unauthorized announcement and Cameca's August 7 confirmation of employment; so once again, plaintiff has failed to show any materially adverse job action that could form the basis of a Title VII claim. Accordingly, because the complaint indisputably shows that plaintiff was not subject to an adverse employment action, he cannot maintain a disparate impact race discrimination claim under Title VII.

## II. Count II: Age Discrimination

The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.* prohibits an employer from discriminating against an individual on the basis of his age and protects employees who are at least 40 years of age. 29 U.S.C. § 623(a). To prove discrimination, plaintiff must show that Cameca subjected him to some form of adverse employment action and took this adverse action on account of plaintiff's age. *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453 (7th Cir. 2011).

Just as with his Title VII claim, plaintiff has no viable claim of age discrimination because he was not subject to an adverse employment action. By plaintiff's own admission, Cameca did *not* pass over plaintiff to give the Field Service Engineer job to someone younger; rather, it offered the job to plaintiff, who chose to turn it down. As just discussed, plaintiff's subjective concerns about *potential* unfair treatment should he accept the offer are not enough to show that he was treated adversely because of his age.

### III.  Count VI:  Violation of Fair Credit Reporting Act

In Count VI, plaintiff alleges that Cameca violated the Fair Credit Reporting Act ("FCRA") by failing to provide him with a copy of the HireRight background check or written notice of his rights before rescinding his job offer.  The relevant provision of the FCRA provides that:

> [B]efore taking any adverse action based in whole or in part on [a consumer report used for employment purposes], the person intending to take such adverse action shall provide to the consumer to whom the report relates—
>
>     (i)    a copy of the report; and
>
>     (ii)    a description in writing of the rights of the consumer under this subchapter….

15 U.S.C. § 1681b(b)(3)(A).

For the purposes of this motion, defendants do not dispute that HireRight's background check was a "consumer report" under the FCRA.  However, the purpose of this disclosure requirement is to "give[] the employee or applicant important information at a time and in a form that allows him to correct errors and address the employer's concerns before any adverse action is taken."  *Rivera v. Allstate Ins. Co.*, 913 F.3d 603, 616–17 (7th Cir. 2018).  Accordingly, defendants argue that plaintiff cannot state a claim under this statute because:  (1) he was not subject to an adverse action; and (2) by plaintiff's own admission, Cameca discovered his conviction through its own internet search, not from

HireRight's background check.  The court agrees.

First, as used in the FCRA, "adverse action" means "a denial of employment or any decision for employment purposes that adversely affects any current or prospective employee."  15 U.S.C. § 1681a(k)(1)(B)(ii).  Although this definition is not necessarily synonymous with "adverse action" in the Title VII context, the fact remains that plaintiff was not subject to an adverse action.  As alleged, Cameca did *not* deny plaintiff employment but instead reaffirmed its job offer.

Second, even if Stroud's August 6, 2020, statement that Cameca *would be* rescinding the offer could theoretically be deemed "adverse" for FCRA purposes, plaintiff admits that Stroud based this decision on information found on the internet, not in the HireRight report.  Plaintiff suggests that the FCRA's notice provision was triggered nevertheless because it was information in the HireRight report that motivated Cameca to search the internet in the first place.  This interpretation of the statute makes no sense.  This would mean that Stroud was obligated to disclose HireRight's report to plaintiff *before* searching his history on the internet, just *in case* she found something damaging that *might* prompt Cameca to take an adverse action.  Plaintiff neither cites nor is the court aware of any authority extending the FCRA's reach this far, particularly where the employer opted to hire the plaintiff regardless of any concerns.  *Accord Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64 (2007) ("Congress meant to require notice and prompt a challenge by the consumer only when the consumer would gain something if the challenge succeeded.").

Accordingly, plaintiff lacks any viable claim that Cameca violated the FCRA as well.[5]

### IV. State Law Claims

Because the federal claims have been dismissed, the court would not use such claims as a basis for exercising supplemental jurisdiction over the plaintiffs' state law claims, even if the court was permitted to do so. *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over claim if it has dismissed all claims over which it had original jurisdiction); *Sullivan v. Conway*, 157 F.3d 1092, 1095 (7th Cir. 1998). Accordingly, the remaining state law claims will be dismissed for lack of subject-matter jurisdiction.[6]

---

[5] In light of the fact that plaintiff has pleaded no actual injury, there is a potential question whether the court should dismiss for lack of standing/jurisdiction rather than under Rule 12(b)(6). As a practical matter, it makes no difference since the court is not exercising supplemental jurisdiction over the state law claims in either event. However, the Seventh Circuit has recently paid more careful attention to this question. *E.g., Gracia v. SigmaTron Int'l, Inc.*, 986 F.3d 1058, 1063 (7th Cir. 2021) (finding no standing in employment case where plaintiff did not establish materially adverse action and did not claim to have suffered emotional injury). After canvassing the case law, a failure to plead adequately an adverse action is typically treated as an element of the prima facie case, resulting in dismissal on the merits.

[6] The court notes that although the parties in this case are of diverse citizenship, plaintiff has not invoked this court's diversity jurisdiction under 28 U.S.C. § 1332 nor alleged any facts suggesting that the statute's $75,000 amount-in-controversy requirement is met. Indeed, given this court's conclusion that plaintiff was not denied employment or subject to any materially adverse employment action, the court would be highly skeptical of any renewed complaint that attempts to proceed under the diversity statute. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir. 2006) (proponent of diversity jurisdiction must offer "good faith estimate of the stakes" that "is plausible and supported by a preponderance of the evidence.").

ORDER

IT IS ORDERED that:

1. Defendants' motion to dismiss the amended complaint (dkt. #20) is GRANTED and their initial motion (dkt. #10) is DISMISSED as moot.

2. Claims 1, 2 and 6 of the Amended Complaint (dkt. #12) are DISMISSED for failure to state a claim under Fed. R. Civ. P. 12 (b)(6).

3. Plaintiff's remaining state law claims (Claims 3, 4, 5, 7, 8 and 9) are DISMISSED for lack of jurisdiction.

Entered this 6th day of August, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge